# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | | |
|---|---|---|
| DAVID PELLERIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 2:14-cv-02318 JWS |
| | ) | |
| vs. | ) | ORDER AND OPINION |
| | ) | |
| CARYN WAGNER, et al., | ) | [Re: Motion at docket 237] |
| | ) | |
| Defendants. | ) | |

## I. MOTION PRESENTED

At docket 237 plaintiffs David Pellerin and Angie Pellerin (the Pellerins) and their children (collectively Plaintiffs) move for a preliminary injunction. All defendants represented by the Arizona Office of the Attorney General (collectively State Defendants) respond at docket 261. The other defendant, Deborah Harper, joins in the response at docket 250.[1] Plaintiffs reply at docket 298. Oral argument was requested, but it would not be of additional assistance to the court given that the court's decision is not based on the merits of Plaintiffs' claim for an injunction.

## II. BACKGROUND

Plaintiffs' complaint arises from the removal of the Pellerin children from the

---

[1] At docket 320, Pellerin and Defendant Harper filed a notice of settlement.

Pellerins' family home in 2013 by agents of the Arizona Department of Economic Security (ADES), which at that time was the agency tasked with providing child protective services.[2] The events leading up to the children's removal began in 2013 when the Pellerins were transferred from the U.S. Air Force base in Japan to Luke Air Force Base in Arizona. ADES subsequently received a report from military authorities in Japan that, prior to the Pellerins' transfer, the military had been investigating allegations that the Pellerins abused their children, and the military requested that ADES investigate the matter further. Based on the military's report, ADES employee Defendant Caryn Wagner interviewed the Pellerins' children and visited the Pellerins' home on May 10, 2013. Defendant Wagner decided that a safety plan for the children needed to be in place that day, and she and the Pellerins agreed to such a plan pursuant to which the children would be in the custody of their grandfather with no unsupervised parent contact pending further investigation and action.[3] Thereafter, ADES alleged that the Pellerins did not comply with the safety plan and subsequently removed the children from their grandfather's home, placed them in temporary foster care, and filed a dependency petition.

During a temporary custody hearing in June of 2013, the Arizona Superior Court ruled that it did not have jurisdiction over the case.[4] It based its decision on the fact that the petition "refer[red] to events that allegedly occurred in Japan, not the state of

---

[2]Arizona's Department of Child Safety (DCS) is the successor to the Arizona Department of Economic Security with respect to its child safety responsibilities.

[3]Plaintiffs allege they had no choice but to agree to the plan to keep their children from being placed with a non-family member in foster case. Doc. 146 at p. 9, ¶¶ 43-44.

[4]Doc. 260 at p. 79 (Exhibit 7); doc. 241 at p. 15 (Exhibit 30).

-2-

Arizona"[5] and that there was no evidence "that would tend to indicate that these parents did anything to these children while they were here in Arizona."[6] The court dismissed ADES's dependency action and ordered that the children be returned to their parents.[7]

ADES did not return the children but instead requested a stay of the dismissal with the Arizona Court of Appeals and filed a special action petition with that court. In the meantime, the Superior Court conducted a hearing the next day to address the failure of ADES to comply with the court's order. The judge stated that Defendant Wagner was not a credible witness. He concluded she had "trampled upon [the Pellerins'] rights" and ordered a show cause hearing regarding her failure to comply with the court's order.[8] However, a few days later, the Court of Appeals issued a stay of the trial court's dismissal of ADES's dependency petition and show cause hearing.[9] In August of 2013, the Arizona Court of Appeals held that the state court had jurisdiction over the matter and ruled that the dependency action could continue.[10]

On October 21, 2013, during a temporary custody hearing, the lower court reiterated that Defendant Wagner was not a credible witness and that the "children are

---

[5]Doc. 241 at p. 14.

[6]*Id.* at p. 12.

[7]Doc. 260 at p. 81.

[8]Doc. 241 at p. 26.

[9]Doc. 261-1 at p. 3 (Exhibit 10).

[10]*Arizona Dep't of Econ. Sec. v. Grant*, 307 P.3d 1003, 1009 (Ariz. Ct. App. 2013); Doc. 261-1 at p. 11 (Exhibit 11).

-3-

not subject to a substantial risk of harm in the custody of their parents."[11] He ordered that they be returned to the care of their parents for the duration of the dependency matter. Subsequently, ADES filed a motion to dismiss the dependency case after the Pellerins completed "Family Preservation Services."[12] The court dismissed the dependency petition in February 2014, releasing the children "from the wardship of the Court, and relieving ADES of further responsibility of the children for the reason of reunification."[13]

Plaintiffs subsequently filed a complaint that alleges the defendants—ADES itself and other individuals who worked for ADES or the Arizona Office of the Attorney General at the time and were involved in their case—violated their civil rights in the course of seizing the Pellerins' children from the family home and placing them in foster care without an adequate basis. Their first six claims are brought pursuant to § 1983. Plaintiffs seek general, special, and punitive damages based upon these claims. Plaintiffs' seventh claim is one for declaratory and injunctive relief. They allege that "they have no adequate remedy at law to prevent or prohibit ADES and its social workers from continuing, and/or repeating, its unlawful and unconstitutional conduct and policies other than through injunctive relief."[14] Plaintiffs subsequently filed this motion seeking preliminary injunctive relief.

---

[11] Doc. 241 at pp. 36-37.

[12] Doc. 260 at p. 91 (Exhibit 12).

[13] Doc. 260 at p. 95 (Exhibit 13).

[14] Doc. 146 at pp. 31-32.

-4-

### III. DISCUSSION

Plaintiffs' motion for a preliminary injunction asks that the court order "the State of Arizona" to take the following actions:

1. Immediately promulgate and implement a procedure, process, and policy, by which its social workers can seek and obtain a removal warrant or order to seize a child from his or her parent's custody under non-exigent circumstances.
2. Train its social workers on the means, process, policy, and procedure to seek and obtain a removal warrant or order to seize a child from his or her parent's custody under non-exigent circumstances.
3. Immediately end its "standard practice" to always seize children from their parent's custody without seeking a removal warrant or order regardless of whether or not exigent circumstances exist.
4. Train its social workers regarding a parent and child's constitutional right to not be separated without a removal warrant or court order, unless the child is in immediate danger of suffering serious physical bodily injury or death within the time it would take to obtain a warrant.
5. Immediately promulgate and implement a disciplinary procedure and policy for social workers that deprive a parent and/or child of their constitutional due process rights.[15]

The only issue before the court at this time is whether such injunctive relief is appropriate.

In their opposition to Plaintiffs' motion for a preliminary injunction, State Defendants argue that Plaintiffs have not named a defendant against whom the injunctive relief sought might be awarded. "The proper defendant for injunctive relief against the State under 42 U.S.C. § 1983 is the state official in his or her official capacity."[16] State Defendants' position is supported by a long line of cases starting with

---

[15] Doc. 237 at p. 2

[16] Doc. 261 at p. 5. Because the response is over-length, a copy was first lodged at docket 248 along with a motion seeking permission to file an over-length memorandum. That motion was granted and the response was then filed at docket 261. The lodged document gave Plaintiffs notice of the arguments State Defendants would rely upon.

-5-

*Ex parte Young*.[17] State Defendants then argue that the various state employees sued by Plaintiffs in their individual capacities are inappropriate defendants for the purpose of obtaining injunctive relief. With respect to ADES, or its successor agency the Department of Child Safety ("DCS"), State Defendants argue that the agency is a non-jural entity under Arizona law, so relief may not be awarded against it. Moreover, State Defendants note that Plaintiffs' motion for preliminary injunctive relief is directed at the State of Arizona itself, which is not a named defendant.

This line of argument prompted Plaintiffs to file a motion for leave to amend the First Amended Complaint by adding the head of DCS in his official capacity only.[18] State Defendants objected to the amendment, arguing that the request was untimely and not supported by good cause. The court agreed with State Defendants and denied Plaintiffs' request to amend the complaint under Rule 16 based upon their lack of diligence in requesting the amendment. The court concluded that "[t]he problem of non-jural entity status was called to the attention of Pellerin repeatedly and from the very early stages of the litigation."[19] Without the amendment, the court must now determine whether injunctive relief is even possible without the proper official named as a defendant.

It is undisputed that the named individual defendants, all employees of ADES at the time in question and some current employees of the successor agency DCS, do not

---

[17] 209 U.S. 123 (1908).

[18] Doc. 252.

[19] Doc. 295 at p. 7.

-6-

have the authority to implement injunctive relief if ordered to do so by the court. Plaintiffs also fail to present any argument that ADES or its successor agency, DCS, are in fact distinct legal entities that can be sued under state law, and therefore non-jural status of the agencies is undisputed.

Plaintiffs argue that the injunction is directed at the State of Arizona itself and not just the agency, despite the fact that the State was not actually named in the complaint. They argue that the State, at all times during this lawsuit knew that they were seeking an injunction regarding its child safety laws, policies, practices, and procedures. They argue that because the Arizona Office of the Attorney General has been representing State Defendants during the litigation and the office represents the State itself, its interests have been adequately protected throughout the litigation. Even putting aside the failure of Plaintiffs to actually name the State as a defendant and assuming Plaintiffs can freely interchange the State for one of its agencies in this suit as they contend they can, the State and its agencies are immune from suit under the Eleventh Amendment regardless of the relief sought unless the state unequivocally consents to a waiver of its immunity.[20] Consent is not inferred but must be "stated by the most express language."[21] The State did not provide any such express consent, and any argument that it consented to litigation based on ADES's participation in the litigation thus far fails because a state does not waive Eleventh Amendment immunity merely by

---

[20] *Yakama Indian Nation v. Washington Dep't of Revenue*, 176 F.3d 1241, 1245 (9th Cir. 1999).

[21] *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990) (internal quotation marks omitted).

-7-

defending in federal court.[22]  Instead, waiver turns on the State's failure to raise immunity during the litigation.[23]  Here, ADES asserted its non-jural status and its sovereign immunity as affirmative defenses.[24]

Plaintiffs argue that while prospective injunctive relief against a state or state agency is not permissible, the failure to name the proper state official as a defendant is a mere technical error that the court can overlook and correct.  That is, not only do they assert that the State and its agencies are interchangeable defendants but also that the State any proper official are as well.  They rely in part on Rule 15 and the purpose behind the rule's liberal amendment policy, which is to allow federal plaintiffs to amend complaints that name incorrect government officials.  However, the court has already analyzed Plaintiffs' request to amend and correct its complaint under Rule 16, which is the rule to consider before Rule 15 when a party files an untimely motion to amend, and it concluded that Plaintiffs were provided multiple opportunities to fix the error that was drawn to their attention but they did not act diligently to add a defendant against whom injunctive relief might be obtained.[25]

Plaintiffs also rely on *Melendres v. Arpaio*[26] and Rule 21 in support if their request for the court to substitute the correct party and proceed with their injunctive relief request.  *Melendres* involved a class action civil rights lawsuit against Maricopa

---

[22]*Demshki v. Monteith*, 255 F.3d 986, 989 (9th Cir. 2001).

[23]*Id.*

[24]*See* doc. 18 at p. 8; doc. 26 at p. 8; doc. 169 at p. 12.

[25]Doc. 295.

[26]784 F.3d 1254, 1260 (9th Cir. 2015) (*Melendres I*).

-8-

County, Maricopa County Sheriff's Office (MCSO), and the official in charge of MCSO, Sheriff Arpaio.[27] At the time the lawsuit was filed, state case law was unclear as to whether MCSO was a jural entity, but the lower court proceeded as if it were and refused to dismiss MCSO as a non-jural entity.[28] It then granted the parties' stipulation to dismiss Maricopa County; however, dismissal was without prejudice to rejoining the county as a defendant if it became necessary to afford the plaintiffs complete relief.[29] Subsequently, the Arizona Court of Appeals ruled in *Braillard v. Maricopa County*[30] that MCSO is a non-jural entity and cannot be sued. However, the case proceeded, and the lower court concluded that a permanent injunction against MCSO and Sheriff Arpaio was warranted. In an appeal, MCSO challenged its ability to be sued given its status as a non-jural entity. The Ninth Circuit held that MCSO was improperly named as a party given *Braillard*, but to assure a meaningful remedy for the plaintiffs, it ordered that Maricopa County be substituted as a party in lieu of MCSO and cited Rule 21 in support, which provides that the court may at any time, on just terms, add or drop a party.[31]

The court finds *Melendres* unpersuasive here. Unlike the plaintiffs in *Melendres*, who had initially named the proper defendant before stipulating to its dismissal without

---

[27]*See Melendres v. Maricopa Cnty.* (*Melendres II*), 815 F.3d 645, 648 (9th Cir. 2016) (discussing the procedural history of the case and the court's ruling in *Melendres I*).

[28]*Melendres I*, 784 F.3d at 1260.

[29]*Melendres II*, 815 F.3d at 648.

[30]232 P.3d 1263, 1269 (Ariz. Ct. App. 2010).

[31]*Melendres I*, 784 F.3d at 1260; *Melendres II*, 815 F.3d at 648.

-9-

prejudice, Plaintiffs never named the proper defendant despite numerous indications that they had failed to do so. Unlike the situation in *Melendres*, there has not been a change in the law regarding the proper defendant to name. Moreover, the defendant substituted for MCSO, Maricopa County, is not immune from suit under the Eleventh Amendment.[32] Given Plaintiffs failure to name the proper defendant despite the clear nature of the law on the issue and multiple opportunities to correct the deficiency, the court does not conclude that substitution of the proper official is just or warranted.

Even if the court were to allow Plaintiffs' request for injunctive relief to proceed despite their failure to name the proper defendant, they nonetheless lack the standing to seek such relief. To meet Article III's standing requirements, a plaintiff must show, in addition to causation and redressibility, that he has suffered an injury in fact that is "concrete and particularized" and "actual or imminent."[33] To meet this requirement in the context of seeking prospective injunctive relief, a plaintiff must also show "that he is realistically threatened by a repetition of [the violation]."[34] The plaintiff must demonstrate a "real and immediate threat of repeated injury."[35] Allegations of *possible* future injury are insufficient.[36] In other words, there must be a "sufficient likelihood" that

---

[32]*See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (recognizing that counties are not arms of the state entitled to Eleventh Amendment immunity).

[33]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[34]*City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 111 (1983); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

[35]*O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

[36]*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotations omitted).

-10-

he will be subjected to the allegedly illegal policy in the future.[37]  Although relevant to the inquiry, "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'"[38]  "[N]o matter how important the issue or how likely that a similar action will be brought [by another party], a court is without jurisdiction if there is not a sufficient likelihood of recurrence *with respect to the party now before it.*"[39]

The burden of showing a threat of repeated injury is on the plaintiff.[40] Plaintiffs do not allege or demonstrate any continuing, present harm to them stemming from their experience with State Defendants' prior conduct, and therefore the court's focus regarding their standing to request injunctive relief centers on whether there is a threat of future harm to Plaintiffs from State Defendants' allegedly unconstitutional conduct.

A plaintiff can demonstrate that allegedly illegal conduct is likely to harm him again in two ways.  "First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy."[41]  "Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'"[42]  Plaintiffs argue that they have

---

[37]*Lyons*, 461 U.S. at 111.

[38]*Id. at* 102 (quoting *O'Shea*, 414 U.S. at 495-96).

[39]*Sample v. Johnson*, 771 F.2d 1335, 1342 (9th Cir. 1985) (emphasis added).

[40]*Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990).

[41]*Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (internal quotation marks omitted) *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005).

[42]*Id.* (alternations in original) (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir.

-11-

alleged and shown both a written policy on the part of DCS that authorizes unconstitutional removal of children from their homes—removal without a warrant or sufficient exigent circumstances—and a pattern of sanctioned unconstitutional seizure of children.[43] Just showing the existence of a policy or pattern of illegal behavior is insufficient. Plaintiffs must still demonstrate that the policy or pattern would likely be applied to them again and that they themselves would likely suffer the same injury in the future.[44]

At the time Plaintiffs filed their complaint, the dependency petition had been resolved and dismissed. There is no allegation or evidence of any pending DCS investigation or continuing DCS supervision of Plaintiffs that could subject them to the specific injury for which they now seek injunctive relief. Also, there is no evidence that they are more likely to be reported to DCS or subjected to DCS investigation simply because of their prior history with the agency. Therefore, regardless of any written policy or practice DCS may follow regarding removal of children from their parents, the likelihood of Plaintiffs being targeted by DCS in the future is no greater for them than

1985)).

[43]It is undisputed that DCS workers do not obtain warrants before removing children, but the record contains evidence that the agency's policy is that the social worker must make a finding that the child is a victim of abuse or in imminent danger of abuse and that no other lesser intrusive options are available before removing a child from a home. Doc. 161-1 at pp. 37-38 (Exhibit 17 at ¶¶ 4-11); doc. 161-1 at p. 15 (Exhibit 14 at ¶¶ 6-8). There are issues of fact as to the meaning of this policy and whether it is interpreted or implemented in a constitutional manner; that is, there are issues of fact as to whether the policy requires exigent circumstances to be present before warrantless removal. Those issue are not relevant to the standing question before the court.

[44]*Lyons*, 461 U.S. at 102.

-12-

any other citizen assuming their compliance with the law.[45]

Instead, the likelihood of Plaintiffs sustaining future injury because of CPS's removal policy or practices is highly speculative. "Both the Supreme Court and [the Ninth Circuit] have repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative contingencies, particularly a chain that includes the violation of an unchallenged law."[46] In *City of Los Angeles v. Lyons* the plaintiff sued the City of Los Angeles for monetary and injunctive relief based on his allegation that the City's police officers placed him in a chokehold during a traffic stop without a constitutional basis for doing so. The plaintiff asked the court to issue an injunction against the City that would prevent its police department from using chokeholds except where the threat of immediate deadly force was present. The Supreme Court held that the plaintiff lacked standing to seek injunctive relief because the claim of future injury was speculative in that it required a string of contingencies before being capable of recurrence– a traffic or criminal violation, a stop by police for such conduct, and then post-stop behavior by a police officer culminating in a chokehold. The court, quoting its prior decision in *O'Shea*, stated that it "'assume[s] that respondents will conduct their activities within the law and so avoid . . . exposure to the challenged course of conduct . . . .'"[47]

*Lyons* is instructive here. In order for plaintiffs to be subjected to unconstitutional

---

[45]*See, e.g.*, *Camacho v. United States*, No. 12-cv-956, 2014 WL 12026060, at * 4 (S.D. Cal. Oct. 29, 2014).

[46]*Nelsen*, 895 F.2d at 1252.

[47]*Lyons*, 461 U.S. at 103 (quoting *O'Shea*, 414 U.S. at 497).

-13-

removal, they would have to harm their children and be reported to authorities.[48] Furthermore, while it is clear from the record that no warrant would be obtained before removal, a report of abuse does not automatically lead to the warrantless removal of children from their homes.[49] The investigating social worker would still have to make a finding that the Pellerins' children were subject to some impending danger before Plaintiffs could again suffer the same injury.[50] In other words, the likelihood of the Pellerins' children being seized again would not only depend on harm to the children and a report of such harm, but also on what any one social worker deems to fit within the DCS's policy for removal.[51] Therefore, as in *Lyons*, Plaintiffs' claim for future injury rests upon a series of contingencies occurring first.

Plaintiffs argue that, unlike the situation in *Lyons*, they cannot avoid future injury by simply avoiding illegal conduct. That is, citizens innocent of child abuse and neglect are at risk of being harmed by DCS's removal policies and practices. They contend that the record shows that the removal of their children was unwarranted and therefore they are at risk of suffering repeated harm. The actual prior innocence of the Pellerins is not relevant to the inquiry; the concern is whether they are sufficiently likely to again be reported for child abuse and neglect, triggering the involvement of DCS and the

---

[48]The record shows that investigation only occurs when DCS receives a report of abuse. Doc. 161-1 at p. 38 (Exhibit 17 at ¶ 7); doc. 161-1 at p. 15 (Exhibit 14 at ¶ 5).

[49]Doc. 161-1 at p. 39 (Exhibit 17 at ¶ 12 and Attachment A);

[50]*See supra* n. 43.

[51]*See O'Shea*, 423 U.S. at 372 (indicating that a claim of future injury is too speculative if it rests upon what one agent might do in the future because of that unknown agent's perception and interpretation of policy).

-14-

application of the agency's allegedly unconstitutional practices and policies.  Before they could suffer injury from the unconstitutional removal of their children despite only legal conduct on their part, someone would have to falsely report abuse to trigger an investigation and then the assigned social worker would have to make the necessary findings.  Therefore, even assuming only legal conduct on the part of the Pellerins, future harm is still highly speculative.  Indeed, the families that Plaintiffs allege falsely accused them of child abuse for personal and malicious reasons live in Japan, and there is no evidence or argument that those families have pursued the matter after Plaintiffs left Japan.  Moreover, as noted above, there is no evidence that State Defendants have contacted or threatened contact with Plaintiffs after the dependency petition was dismissed, which was close to four years ago.

## IV.  CONCLUSION

For the reasons discussed above, Plaintiffs' motion for a preliminary injunction at docket 237 is DENIED.

DATED this 21st day of December 2017.

/S/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

-15-